# EXHIBIT F



Your Missouri Courts

Missouri
Case.net

Search for Cases by: Select Search Method...

Judicial Links | eFiling | Help | Contact Us | Print

Logon

**1216-CV23784 - STAHR D ASHURST ET AL V J P MORGAN RETIREMEN ET AL (E-CASE)**

| Case Header | Parties & Attorneys | Docket Entries | Charges, Judgments & Sentences | Service Information | Filings Due | Scheduled Hearings & Trials | Civil Judgments | Garnishments/ Execution |

This information is provided as a service and is not considered an official court record.

Sort Date Entries: ● Descending ○ Ascending

Display Options: All Entries

| 09/28/2012 | **Motion for Leave** |
| | to file 2nd amended petition 1-MLEAV |
| | **Filed By:** STAHR D ASHURST |
| | **Proposed Order Filed** |
| | 1-FPORD |
| 09/25/2012 | **Correspondence Filed** |
| | Service Instructions 1-FCORR |
| | **Notice** |
| | of Case Management Conference February 7, 2013 at 10:00 am in Division 13 |
| 09/21/2012 | **Correspondence Sent** |
| | 1029 7 copies of Amended petition needed for service |
| 09/20/2012 | **Amended Motion/Petition Filed** |
| | 1-FAMMF |
| | **Filed By:** STAHR D ASHURST |
| 09/13/2012 | **Case Mgmt Conf Scheduled** |
| | **Scheduled For:** 02/07/2013;  10:00 AM ;  CHARLES H MCKENZIE;  Jackson - Independence |
| 09/12/2012 | **Judge Assigned** |
| | **Confid Filing Info Sheet Filed** |
| | 1-FINSH |
| | **Filed By:** RANDALL E HENDRICKS |
| | **Pet Filed in Circuit Ct** |
| | 1-APTCC |

Case.net Version 5.12.1.1.1          Return to Top of Page          Released 08/06/2012

# IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI, AT INDEPENDENCE
## SIXTEENTH JUDICIAL CIRCUIT OF MISSOURI
### (INDEPENDENCE)

Stahr D. Ashurst )
1609 S. Whitney Dr. )
Independence, MO 64057 )
)
Valerie Arrocha )
3744 Elmwood )
Kansas City, MO 64128 )
)
LeAnn M. Belew )
521 SW Moore )
Blue Springs, MO 64014 )
)
Linda Sue Beltz )
2601 S. Milton Dr. )
Independence, MO 64055 )
)
Lori Boniedot )
1331 S. Randall Rd. )
Independence, MO 64055 )
)
Sheila R. Brock )
2848 SW Carlton Dr. )
Lee's Summit, MO 64082 )
)
Kathleen Burmeister )
511 SE 19th St. )
Oak Grove, MO 64075 )
)
Cathleen Cameron )
318 11th Pl. )
Rogers, AR 72756 )
)
Jeanetta Cobb )
3605 NW Hidden Pointe Dr. )
Blue Spring, MO 64015 )
)
Kathy Cox )
405 N. Cochise Dr. )
Independence, MO 64056 )
)
Heather D. Craft )
1427 ½ South Sterling Ave. )

1216 - CV23784

CASE NO.

DIVISION

FILED-CIRCUIT COURT
JACKSON CO., MO-1
2012 SEP 12 PM 4: 29

1

Case 4:12-cv-01244-BP   Document 1-7   Filed 10/11/12   Page 3 of 40

Independence, MO 64052                    )
                                          )
Brenda S. Dannaldson                      )
829 N. Ponca Dr.                          )
Independence, MO 64056                    )
                                          )
Cicilyn Davis                             )
4906 Wallace Ave.                         )
Kansas City, MO 64129                     )
                                          )
Terri Davis                               )
17917 S. Hilltop Rd.                      )
Pleasant Hill, MO 64080                   )
                                          )
Shirley Dieckhoff                         )
721 N. Sioux Ave.                         )
Independence, MO 64056                    )
                                          )
Gayla Dowell                              )
16921 York Ave.                           )
Independence, MO 64055                    )
                                          )
Heather Downey                            )
3572 NE Austin                            )
Lee's Summit, MO 64064                    )
                                          )
Wilma J. Ebert                            )
950 S. State Route 7                      )
Independence, MO 64056                    )
                                          )
Karen Euritt                              )
26307 E. Blue Mills Rd.                   )
Sibley, MO 64088                          )
                                          )
Margaret A. Evans                         )
10216 E. 96th St.                         )
Kansas City, MO 64134                     )
                                          )
Sara Ferguson                             )
2905 NW 4th St. Terr.                     )
Blue Springs, MO 64014                    )
                                          )
Cathleen R. Frantz                        )
707 W. Hwy 224                            )
Wellington, MO 64097                      )
                                          )

2

Lynn Frentrop                           )
1213 NE 82nd Terr.                      )
Independence, MO 64118                  )
                                        )
Charlene Fitzhugh                       )
8708 E. 92nd Pl.                        )
Kansas City, MO 64138                   )
                                        )
Kimberly Foudree                        )
4424 NE Shadow Valley Cir.              )
Lee's Summit, MO 64064                  )
                                        )
Emily Galloway                          )
3613 Lake Shore Dr.                     )
Blue Springs, MO 64014                  )
                                        )
Amy Gardipee                            )
PSC 812 Box 3130                        )
FPO AE 09627                            )          )
                                        )
Sharon Grammer                          )
2017 N. Ponca Dr.                       )
Independence, MO 64058                  )
                                        )
Linda Green                             )
6515 NW Quail Run Dr.                   )
Parkville, MO 64152                     )
                                        )
Lynn Green                              )
1410 E. Salem Ln.                       )
Olathe, KS 66062                        )
                                        )
Patricia Hake                           )
304 NE Forest Ave., Apt. C              )
Lee's Summit, MO 64063                  )
                                        )
Kayla Hale                              )
526 El Lago Circle                      )
Climax Springs, MO 64324               )
                                        )
Minnie Henson                           )
12206 E. 56th Terrace                   )
Kansas City, MO 64133                   )
                                        )
Myrle Hill                              )
5279 Spruce                             )

3

Kansas City, MO 64130                              )
                                                   )
Janice Hohenburg                                   )
16612 E. Gudgell, Apt. D                           )
Independence, MO 64055                             )
                                                   )
Deborah Hopkins                                    )
19202 E. 28th St. S.                               )
Independence, MO 64057                             )
                                                   )
Vicki Hopkins                                      )
27606 Rogers Rd.                                   )
Buckner, MO 64016                                  )
                                                   )
Lynn Huff                                          )
3611 S. Bolger Ct.                                 )
Independence, MO 64055                             )
                                                   )
Melanie Jefferson                                  )
1405 E. 66th St.                                   )
Kansas City, MO 64131                              )
                                                   )
Soteria Jenkins                                    )
2514 N. Six Mile Church Rd.                        )
Independence, MO 64058                             )
                                                   )
Cynthia Jones                                      )
3337 Askew                                         )
Kansas City, MO 64128                              )
                                                   )
Robert Kordalski                                   )
17925 Mission Rd.                                  )
Stillwell, KS 66085                                )
                                                   )
Tamara Liber                                       )
19703 NE 197th Terr.                               )
Smithville, MO 64089                               )
                                                   )
Paula Luna                                         )
200 S. Shrank Ave.                                 )
Independence, MO 64056                             )
                                                   )
Pamala McGee                                       )
1900 N. Concord Rd.                                )
Independence, MO 64058                             )
                                                   )

4

Leona McGinnis )
16414 E. Cogan Rd. )
Independence, MO 64055 )
)
Michael McMurray )
506 Deer Ln. )
Pleasant Hill, MO 64080 )
)
Saundra McRae )
34609 Pink Hill Rd. )
Grain Valley, MO 64029 )
)
Cecil Morris )
3813 SW Windmere Dr. )
Lee's Summit, MO 64082 )
)
Mowetha Ndettei )
226 Douglas Rd. )
Warwick, RI 02886 )
)
Sandra Oertwig )
E. 20th St. S. )
Independence, MO 64050 )
)
Tamara O'Hare )
5401 S. Harding St. )
Oak Grove, MO 64075 )
)
Sheri Orr-Davidson )
17676 N. Union Rd. )
Lawson, MO 64062 )
)
Jo Parker )
6414 Ridgeway Ave. )
Kansas City, MO 64133 )
)
Diane Postlethwait )
3603 S. Drumm Ave. )
Independence, MO 64055 )
)
Bernice Pryor )
1801 E. 97th Terr. )
Kansas City, MO 64131 )
)
Linda Rohaus )
1124 SW Eastman St. )

5

Blue Springs, MO 64015 )
)
Connie Schmidt )
18004 E. 18th St. N. )
Independence, MO 64058 )
)
Beatrix Schmitt )
5702 N. Norton Pl. )
Gladstone, MO 64119 )
)
Shirley Scott )
19400 E. 37th Terr. Ct. S. Apt. 316 )
Independence, MO 64057 )
)
Peggy Smith )
12016 Markham Rd. )
Independence, MO 64052 )
)
Troy Spencer )
14350 W. 187th Terr. )
Olathe, KS 66062 )
)
Carolyn Thomas )
1903 E. 16th )
Kansas City, MO 64127 )
)
Deborah P. Thomas )
4020 Lawn Ave. )
Kansas City, MO 64130 )
)
Shanna Thompson )
31 NW 102nd St. )
Kansas City, MO 64155 )
)
Paris Valleau )
11623 E. 85th St. )
Raytown, MO 64138 )
)
Virginia Wanamaker )
1712 Ashley Dr. )
Independence, MO 64058 )
)
Joyce Webb )
7500 E 108th St. )
Kansas City, MO 64134 )
)

6

Cynthia White
1300 Cottonwood Dr.
Greenwood, MO 64034

Teresa White
4009 S. Maybrook Ave.
Independence, MO 64055

Chandra Williams
503 Palomino Ln.
Ogden, KS 66517

Eavy Wilson
8526 Bruns Rd.
Richmond, MO 64085

Sheila Wittmeyer
36 Anchor Dr.
Lake Tapawingo, MO 64015

                       PLAINTIFFS,

    vs.

J.P. MORGAN RETIREMENT PLAN
SERVICES, LLC,
Serve at:     6580 Sprint Parkway
               Overland Park, KS 66251

JP MORGAN CHASE & CO.
Serve at:     270 Park Avenue
               New York, NY 10017
       and

J.P. MORGAN ASSET MANAGEMENT
HOLDINGS, INC.
Serve at:     270 Park Avenue
               New York, NY 10017

       and

7

J.P. MORGAN INVEST HOLDINGS, LLC )
f/k/a J.P. MORGAN INVEST, INC. )
<u>Serve at:</u>    270 Park Avenue )
            New York, NY 10017 )
 )
 )
 )
    and )
 )
 )
David Embry )
<u>Serve at:</u>    1215 W. 57th Terrace )
            Kansas City, Missouri, 64113 )
 )
    and )
 )
Jennifer Mendicki O'Neill )
 )
<u>Serve at:</u>    4618 Warwick Road, #4D )
            Kansas City, Missouri, 64112 )
 )
 )
James E. Staley )
 )
<u>Serve at:</u>    270 Park Avenue )
            New York, NY 10017 )
 )
                   DEFENDANTS. )

## PETITION

Plaintiffs allege as follows:

## INTRODUCTION

1.    This case arises from the false misrepresentations and willful misconduct by

J.P. Morgan Retirement Plan Services, LLC ("JPMRPS") and its agents, J.P. Morgan Chase &

Co. ("JPMC"), J.P. Morgan Asset Management Holdings, Inc. ("JPMAM"), J.P. Morgan Invest

8

Holdings, LLC, f/k/a J.P. Morgan Invest, Inc. ("JPMI"), J.P. Morgan Retirement Plan Services, LLC ("JPMRPS"), and the individual defendants, David Embry, Jennifer Mendicki O'Neill and James E. ("Jes") Staley, who were each officers or managers of JPMRPS or a controlling person of JPMRPS in a scheme by these defendants to unlawfully enrich JPMRPS, and its agents at the expense of the Plaintiffs. All defendants are hereinafter collectively referred to as "JPM", "JP Morgan" or, at times, "defendants".

2. The scheme to unjustly enrich JPM entailed the sale to the Plaintiffs of the stable value product, that JPM called "SAIF" (standing for "Stable Asset Investment Fund") and referred to herein as "SAIF", "JPM Stable Value Product" or "JPM Product". Defendants wrongly profited from the sale of the JPM Product by misrepresentations and willful, deceptive practices that induced Plaintiffs to purchase the JPM Product, while unbeknown to Plaintiffs, the hidden risks of the JPM Product belied the represented safety of the claimed superior yield performance, or investment return of SAIF.

3. Starting as early as 2005 (including specific meetings on March 19 and August 1, 2005) and continuing through the first half of 2008, in meetings and contacts led by JPMRPS, the defendants conspired and acted in concert to represent to Plaintiffs and the Plaintiffs' agents that the JPM Product would give superior return, superior market-to-book value and at the same time employed less risk than other stable value products, when in fact it contained riskier, lower quality mortgages and other debt instruments, and riskier private, self-rated mortgages with overstated market value. This disguised higher risk (taken in an attempt to gain a higher yield) caused the JPM Product to perform poorly during the financial downturn, generally the last quarter of 2008 through the present. JPM misrepresented the market value of asset-backed or mortgage-backed investments and the actual risk and the past performance of the JPM Product

9

sold to Plaintiffs. Further, JPM misrepresented that the JPM Product had the same attributes such as liquidity as other money market funds when, in fact, a sizable portion lacked liquidity.

4. Part of the scheme involved steering Plaintiffs' investment options away from safer and better-run stable value products, like the American Century Stable Value Product, for the purpose of getting Plaintiffs into the JPM Product from which JPM could earn multiple undisclosed fees.

5. By the scheme, JPMRPS itself profited by receiving monies equal to 50% of the management fee and by earning other substantial incentive credits—all for pushing SAIF over competing, superior stable value funds.

6. The allegations in this Petition are supported by findings of an arbitration panel that issued a $373 million award against JPMRPS on August 10, 2011 in connection with JPMRPS's promotion of the JPM Stable Value Product over the superior stable value product offered by American Century. Those findings were set out in a 72-page opinion of an independent panel consisting of a former judge and two AAA panel lawyer-arbitrators experienced in complex financial litigation. Each of the individual defendants were witnesses in that six week arbitration, which took place in February-March, 2011. As found by the arbitrators, individual defendants Embry and Mendicki O'Neill)"had their compensation impacted through bonus pool amounts...connected to the placement of JPMAM products and their personal employment positions informed by an understanding that sales and promotion of JPMAM products were more beneficial to their careers."

7. In meetings held just before the July 2006 transfer of over $30 million in Plaintiffs' monies to the JPM Product, defendants represented that the JPM Stable Value Product was, "your most conservative investment option." In many forums, including its website and in

10

multiple presentations, including presentations to Plaintiffs and to Plaintiffs' representatives, JPMRPS and its agents/co-defendants, misrepresented the JPM Stable Value Product as having less risk and higher yield than other stable value products.

8. JPMs' sales ploy was a ruse. While JPM touted the conservatism of its JPM Product, JPM in fact used its JPM Stable Value Product as a vehicle for placement of mortgages and other debt instruments having a higher risk (both liquidity and credit risks) and lower quality, hoping that by taking this hidden risk it could gain a higher yield.

9. JPM's misrepresentations led to Plaintiffs' investment in the JPM Stable Value Product during the financial crisis that centered on the years between 2008-2010. At all material times, while defendants sold the JPM Product as a stable value fund, defendants were in fact diverting a substantial portion of the assets of the JPM Product into unduly risky mortgage-backed assets that were in many cases, generated, priced and even self-rated by JPM.

10. JPM used the sales promise of an enhanced yield from its JPM Product (which it achieved by taking undisclosed and inappropriate risks, and by self-rating and valuing its "Private Mortgages") to build its sales of the JPM Product, thereby earning multiple layers of fees, some undisclosed, that benefitted defendants. In sum, JPM employed deceptive practices in order to gain millions of dollars in fees.

11. JPM knew, before the financial crisis, of the risks inherent in the JPM Product and thus to the safety of the JPM Product's yield versus other stable value products' yield. Defendants intentionally exposed Plaintiffs to future yield underperformance and liquidity constraints.

12. JPM and affiliated companies decided in October 2006 – shortly before the subprime storm hit Wall Street and Main Street alike with full force – to dump major portions of

11

their then considerable investment positions in low quality mortgage assets. JPM knew that SAIF contained low-quality mortgage assets, yet sold SAIF to Plaintiffs knowing that only others, either Plaintiffs or insurers of SAIF, bore the risk from the low-quality assets.

13. Starting in late 2006, JPM and affiliated companies had more than $12 billion of low-rated mortgage assets on JPM's "books". Thus at the same time that JPM and/or affiliated companies were selling their own positions in lower quality mortgages, similar low-rated and illiquid mortgage positions were placed in the JPM Stable Value Product, which was sold to Plaintiffs. While at the same time JPM was reducing its exposure to lower rated mortgage loans, it was marketing SAIF with this increased risk exposure to purchasers of its JPM Stable Value Product, which, by representation, was supposed to combine the safest, most conservative investment choice and a higher yielding fund than other stable value products.

14. While this ploy benefited defendants in the accumulation of billions of dollars into the JPM Product, from which it reaped profits, JPM harmed Plaintiffs and other purchasers of the JPM Product, who were stuck with the significantly declining yield on risky mortgages starting in 2008. These higher- risk mortgage positions explain why the JPM Product temporarily outperformed competitor stable value funds until the start of the financial crisis, then fell behind its competitor funds, return-wise, by a wide margin. This ploy was not happenstance. By attracting Plaintiffs' investment monies by promising higher yields, JPMRPS and its agents gained for themselves the earnings from the multiple fees charged for monies put into SAIF.

15. In November, 2008 and subsequent months, the JPM Product's market value fell to as low as the mid-80 percent. The average stable value fund at that time had market values in the mid-90 percent according to Hueler, an industry data reporting service.

12

16.     Through the aforementioned course of self-dealing, JPMRPS and its agents violated Missouri's Merchandise Practices Act and breached the duties set out in the counts presented below. These breaches have directly and proximately caused Plaintiffs to suffer significant financial harm. Damages to Plaintiffs have manifested themselves in, among other things, substantial diminution in their investment returns on the JPM Product. This action seeks to obtain relief from defendants' wrongful acts, including damages sustained by Plaintiffs and ill-begotten profits JPM got as a direct and proximate result of those acts.

17.     Defendants at all material times just before and during the financial crisis knew that a substantial portion of JPM's higher-risk mortgage and other assets, were being sold to Plaintiffs via touting SAIF as a "stable" and "conservative" investment product. Those moves were undertaken by defendants with an "eagle eye" to defendants' benefit and a callous indifference to the interests of Plaintiffs and other investors in the JPM Product.

18.     Defendants' willful and malicious misconduct has directly and proximately harmed Plaintiffs.

## PARTIES

19.     Plaintiffs are employees of Government Employees Health Assessment (GEHA) who purchased and invested in the JPM Stable Value Product (sometimes referred to by JPM as "SAIF"), during approximately 2008-2010.

20.     Plaintiffs do not assert any claims against fiduciaries as defined by ERISA and do not assert or allege an ERISA claim. None of the defendants exercise or exercised discretionary authority or control over management of the Plan or its assets. The alleged scheme is about deception and willful misconduct in the sale by JPMRPS and its agents of JPMRPS product services to Plaintiffs.

13

21.     JPMRPS is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business now located at the Sprint Campus on College Boulevard, Overland Park, Kansas. At the time of the acts alleged herein, JPMRPS was located on Ward Parkway in Jackson County, Missouri.

22.     JPMRPS has at all relevant times represented that it is not an ERISA fiduciary to its client Plans. In its April 1, 2001 agreement with the GEHA Plan Administrator, JPMRPS asserted that the "Plan Administrator is the fiduciary under the Plan". Further, in describing its services to the Plan, JPMRPS stated that it "shall be liable to the Plan or its Participants only for its negligent actions, negligent failure to act, or willful misconduct of itself or its agents, or as required by applicable law." By contract, JPMRPS sought to exclude ERISA liability.

23.     Further, in its renewed and updated agreement(s), JPMRPS agreed and asserted that its services did not require it to: "act as a fiduciary with respect to the Plan or to exercise any discretionary authority or discretionary control with respect to the. . . assets of the Plan" and that "its relationship" with the Plan Sponsor was "that of independent contractor."

24.     The SAIF is managed and controlled by an entity not a party to this case, the SAIF trustee JP Morgan Chase Bank, N.A. (Bank, N.A.). Bank, N.A. alone assumed the role of Trustee and ERISA fiduciary. In its Declaration of Trust, the Bank, N.A. declared:

> *Section 1.1.* **Title.** "The title of the trust fund hereby established shall be "Commingled Pension Trust Fund (Stable Asset Income) of JPMorgan Chase Bank, N.A." (formerly known as the Bank One Asset Income Fund)."

> *Section 1.2.* **Purpose.** "JPMorgan Chase Bank, N.A., a national banking association. . . is adopting this Declaration of Trust as successor trustee to the Bank One Trust Company, N.A. of the Bank One Stable Asset Income Fund. . . This commingled trust fund is established, operated and maintained by JPMorgan Chase Bank, N.A. <u>exclusively</u> as a medium for the collective investment

14

and reinvestment, without distinction between principal and income, of moneys or other assets of participating trusts."

*Section 1.3.* **Definitions.** "...(d) The term "Trustee" shall mean JPMorgan Chase Bank, N.A. . ."

*Section 1.4.* **Effect of Declaration of Trust.** "The provisions of this Declaration of Trust, as the same may be amended from time to time, shall control all participations in the Commingled fund and the rights and benefits of all persons interested in such participations as beneficiaries or otherwise. "

*Section 4.1.* **Title, Custody and Location Investments.** "The ownership of all of the assets in the Commingled fund shall be vested solely in the Bank as Trustee and shall be considered as assets held by it as Trustee."

*Section 4.3.* **Additional Investment Provisions.** ". . . the Trustee shall have the power to: (1) invest and reinvest any moneys at any time forming any part of the Commingled fund in any property. . .

Trustee shall invest the assets of the Commingled Fund in a manner consistent with the provisions of ERISA. . .(e) The decision of the Trustee as to whether or not an investment is of a type which may be purchased for the Commingled Fund shall be conclusive."

*Section 4.4.* **Additional Powers of the Trustee.** ". . . (g) to cause or authorize any investments from time to time held by it to be registered in, or transferred into its name as Trustee, or the name of its nominee, or in the name of any other nominee, or to retain them unregistered or in form permitting transferability by delivery; and to deposit any such investments in or with any depositary, sub-custodian, clearing corporation, or any central system for handling of investments, or any nominee thereof; but the books and records of the Trustee shall at all times show such investments are part of the Commingled fund;. . ."

15

*Section 5.1.* **Division into Units.** "The Commingled Fund shall be divided into units and the proportionate interest of each participant shall be evidenced by the number of units and fractions of a unit allocated to it based upon the amount of the moneys of such participant paid into the Commingled fund. The original value of each unit of participation shall be determined by the Trustee. . ."

*Section 6.1.* **Frequency of Valuation.** ". . .the Trustee shall determine the value of the Commingled Fund and the units thereof in the manner prescribed in this Declaration of Trust. . ."

*Section 8.1.* **Participation Records.** "Records shall be maintained for the Commingled Fund which shall show with respect to each participant:

  (a) The date of each admission to the Commingled Fund, the number of units allotted and the amount paid therefor;
  (b) The date of each withdrawal, the number of units redeemed, the amount paid on redemption to the participant and whether payment was made in cash, in kind or partly in cash and partly in kind:. . ."

**ARTICLE IX. MANAGEMENT FEES AND EXPENSES.**
**Commingled Fund-Institutional Class:** ". . . The Trustee shall charge a management fee directly against the Commingled Fund-Service Class in the amount of 45 basis points (0.45%)

**ARTICLE XIII. ACCEPTANCE OF TRUST AND TRUST FUND.** "JPMorgan Chase Bank, N.A. by execution of this Declaration of Trust hereby signifies its acceptance of the trust and trust fund created hereunder and acknowledges that as Trustee it is a fiduciary with respect to each participating trust which is an employee benefit plan subject to ERISA."

25.    JPMI, a corporation, is organized and existing under the laws of the State of

Delaware, and has its place of business at 270 Park Avenue, New York, New York. Upon

information and belief, JPMI is an affiliate of JPMRPS and sits above JPMRPS in the corporate

structure.

16

26.     Upon information and belief, JPMAM, sits above JPMI and JPMRPS in the JPM organizational structure. JPMAM is a Delaware corporation with its principal place of business at 270 Park Avenue, New York, New York 10017. JPMAM is an affiliate company to JPMRPS and is in the asset management business within the global financial services firm often referred to as JP Morgan Chase & Co. JPMAM holds trillions of dollars in assets under supervision.

27.     The ultimate parent of each corporate defendant is JPMorgan Chase & Co. ("JPMC"), the nation's largest bank based on market capitalization. JPMC is a component of the Dow Jones Industrial Average and serves millions of consumers in the United States. It has over 200 subsidiary companies including the defendant affiliates named in this suit. All JP Morgan entities report consolidated earnings or profits through JPMC. One purpose of the scheme alleged is the channeling of profits for accumulating monies in the JPM Stable Value Product ultimately to JPMC but reflected in largest part as "profits" or revenues on JPMRPS's books. JPMC's liability, in part, is based on respondeat superior principles. Its stock is sold and traded under the symbol "JPM."

28.     David Embry was the Senior Vice President of JPMRPS in charge of marketing and sales during the time of the sale of the JPM Product to Plaintiffs. He was a major participant in and had control of the scheme set out in this Petition. He is a Missouri resident who resides near Ward Parkway in Kansas City, Missouri. He and defendant O'Neill profited from the sale of the JPM Product through bonuses and other additional compensation. In addition, JPMRPS and JPMAM profited by pushing and selling the riskier JPM Product to Plaintiffs.

17

29.   Jennifer Mendicki O'Neill is a Strategic Relations Manager who resides in Jackson County, Kansas City, Missouri. She earned bonuses and other compensation from the sale of the JPM Stable Value Product over less risky stable value products sold by American Century and other institutions and was a participant in the scheme set out herein.

30.   James E. Staley, an individual, is a New York resident. He held officer positions in various JP Morgan entities. At times relevant to the claims asserted herein, he was the CEO of JPMAM, which is the JPMC entity that sits atop JPMC's asset and wealth management business. Mr. Staley was also a managing director of JPMC and served on the Executive Committee of JPMC. The JP Morgan entities named as defendants are controlled and directed through common or interlocking directors or officers, including particularly the defendants Staley and Embry. Staley directly orchestrated the purchase of JPMRPS in 2003 from a Missouri company, American Century, and held ultimate decision- making authority over and directly participated in the activities alleged herein including ordering and/or approving the acts that induced Plaintiffs' purchases of the JPM Stable Value Product. During the same time period of JPM's wrongful sales scheme (which include specific meetings on March 19 and August 1, 2005 and other meetings in 2006 prior to Plaintiffs' "mapping" of over $30 million to SAIF), Staley was presented with direct evidence of the higher risks inherent in SAIF and, in spite of that knowledge, he permitted, promoted and directed the continued wrongful advertising, marketing and sale of the JPM Stable Value Product through JPMRPS's direct contacts with Plaintiffs and Plaintiffs' representatives. Staley pushed for inclusion of JP Morgan proprietary products, like the JPM Stable Value Product, to the exclusion of better performing funds or funds charging less fees to investors. His motive was to increase JPM profits at the expense of Plaintiffs. Staley's conduct in this regard was recently reported in July 2 and 3, 2012 media

18

articles, including in the <u>NY Times</u>, and such conduct was recently described in a 72 page Arbitration Award of $373 million against JPM, which this Court has previously affirmed and upon which this Court has entered judgment.

31.     For the purpose of the acts alleged herein, the corporate defendants are alter egos of JPMRPS and operate as a single entity and instrument to achieve profit goals and to commit the wrongful acts alleged herein. Further, the defendants Staley, Embry and O'Neill conspired with, acquiesced in, participated in and/or directed the inequitable and tortious acts and the violations of Missouri statute and common law set out in this Petition. For purpose of this Petition and because of the alter ego and interlocking agency relationship with JPMRPS, all references herein to "JPM" or to "JP Morgan" are inclusive of and by definition include all defendants.

32.     While JPMRPS and the other corporate defendants may technically exist as separate corporations, the individual defendants controlled, oversaw, and executed the policies and the scheme conducted by JPMRPS and its agents.

33.     Plaintiffs' are informed and believe, and therefore allege, that at all relevant times each of the individual were acting within the course and scope of employment and with the ratification and approval of JPMRPS.

34.     Defendants are individually sued as participants, agents and as aiders and abettors in the improper acts, plans and schemes by JPMRPS to advertise, market, and sell the JPM Stable Value Product to Missouri residents.

35.     Missouri law, as invoked in the causes of action asserted herein, provides relief to Plaintiffs in a manner not impinging upon or duplicative of any federal law or regulation.

19

36.     Defendants have participated as conspirators in furtherance of JPMRPS' willful misconduct set forth herein or have acted with or in furtherance of such scheme in carrying out their purposes as alleged in this Petition, and have performed and continue to perform unlawful acts and made false and misleading statements in Missouri in furtherance of their violations of Missouri law as alleged herein.

## JURISDICTION AND VENUE

37.     The Court has personal jurisdiction over each defendant because the causes of action asserted herein arise out of the defendants' commission of tortious and inequitable acts, and breaches of statutory duties, all of which occurred in, were directed at, and/or caused injury and damage to the Plaintiffs in Jackson County, Missouri.

38.     The Court also has personal jurisdiction over each defendant because each defendant is subject to general and specific jurisdiction in the State of Missouri and/or resides in Missouri.

39.     Venue is proper in this Court because Plaintiffs were first injured and continue to be injured in Jackson County, Missouri, by defendants' commission of tortious acts and breaches of contract in Jackson County, Missouri and because Plaintiffs are located in Jackson County, Missouri and defendants JPMRPS, Embry and Mendicki O'Neill were located in Jackson County, Missouri at the time of the acts of breach and the tortious acts alleged herein.

40.     All of the claims in this action arose from events or occurrence that occurred in the State of Missouri, and those events and occurrences caused injuries in the State of Missouri.

## MARKETING AND SALE OF JPMORGAN STABLE VALUE PRODUCT

20

41. At all times relevant to this Petition, Bank, N.A. unilaterally calculated the JPM Product's Net Asset Value ("NAV") or private market price of SAIF.

42. The NAV's unit price was quoted privately to Plaintiffs by JPMRPS and/or its agents—not in an active market. JPM caused Plaintiffs to purchase the product at the artificial value calculated- a value that was in excess of its true "market-to-market" value, thereby damaging Plaintiffs at time of purchase and thereafter.

43. The investment product sold by defendants and purchased by Plaintiffs is a pooled stable value product, meaning JPM sold this product to others who "pooled" their money into one investment product.

44. JPM touted the JPM Stable Value Product as offering the utmost in safety and liquidity while beating the returns of other stable value funds and money market funds, and as invested in "investment grade" fixed income securities. A stable value fund, by common definition, invests in high-quality, liquid, diversified, fixed-income debt and is designed to preserve the capital of those who buy the product while providing steady, positive above-money-market rates of return. JPM misrepresented that the liquidity of the JPM Stable Value Product was the same as money market fund.

45. Defendants marketed and sold the JPM Product as a typical stable value fund. In their marketing materials, defendants described the product as, "seeking to preserve the value of money invested," and "perform[ing] better than the average money market fund, and earn[ing] consistent, reliable returns". Defendants represented the product to be invested in "high quality fixed income portfolio," and stated that "the fixed income portfolio consists of investment grade fixed income securities". Defendants touted "SAIF" as providing superior returns to competing

21

stable value products. These misrepresentations were made on the website "Fact Sheets" and at meetings with the Plaintiffs and Plaintiffs' representatives.

46.   Defendants emphasized that the JPM Product was a typical stable value fund, not only by calling it "Stable Value," "SAIF" or a "Stable Asset" Fund, but also by their characterization of the risk level of the JPM Product. On a scale of 1-5, with 1 being the most conservative and 5 being the most aggressive, defendants consistently stated that the JPM Product was a 1 (most conservative). JPM stated publicly that the JPM Product is among the "most conservative" investments possible.

### Performance of the JPM Stable Value Product

47.   JPM touted SAIF's results as outperforming its competitors.  Defendants drew investors to the JPM Product by emphasizing this artificial, temporary, above-market performance (compared to other stable value funds) never disclosing that it gained performance by taking higher risk.  For example, just before the financial crisis, the JPM Product reported returns in 2006 over 5%. At no time did JPM disclose that the SAIF used higher risk collateralized or asset backed instruments and utilized self-rated and self-valued investments in its JPM Product as a means of accomplishing those returns.

48.   JPM's scheme involved specific misrepresentations to Plaintiffs' agents and Plan fiduciaries in meetings just before the July, 2006 transfer of over $30 million by Plaintiffs to SAIF.

49.   At times in this period and in specific meetings discussed above, JPM touted SAIF's book-value return performance as consistently above the Citigroup 3-month Treasury Bill Index and other indexes, which defendants held out as relevant benchmarks. However, the Citigroup 3-month Treasury Bill Index is comprised entirely of liquid, high-quality, investment

22

grade securities. JPM did not disclose that SAIF self-valued certain investments to rig the reported book and market values of the JPM Product.

50.     From 2008-2010, the JPM Product's performance changed dramatically as the financial downturn revealed the true nature of the JPM Product's investments. Thus, competitor stable value funds and the industry benchmarks markedly outperformed the JPM Product. JPM's Product trailed its peers for each year since 2008 according to Hueler. Over this period, the JPM Product's investment yields dropped precipitously. At the same time, the JPM Product's benchmarks greatly exceeded the JPM Product's yield, and competitors' stable value funds were consistently yielding higher annual returns. Had the JPM Product not been invested in unduly risky mortgage debt– and had it not paid significant undisclosed fees to defendants for those inappropriate investments – the JPM Product's yielded returns in 2008 to date would have been substantially higher.

51.     For the years 2008 to date, the losses to Plaintiffs from the reduction in yielded returns of the JPM Product caused by JPM's wrongful conduct are estimated, prior to receiving JPM's data, to exceed $1 million. This underperformance relative to true stable value funds accretes daily as Plaintiffs have lost compounding effects, and because JPM "gated" the JPM Product, meaning certain restrictions were put in place that barred, deterred, or inhibited Plaintiffs or their employer plan administrator, from removing their assets from the JPM Product and going to stable value funds or other investment products with higher yields.

### JPM Exposed Plaintiffs to Risky Assets

52.     Leading up to 2008 (and even afterwards), defendants stated (including web site "Fact Sheet" postings) that the JPM Product's portfolio of investments consisted of investment grade, fixed-income securities, primarily U.S. Treasury, agency, corporate, mortgage-backed,

23

asset-backed, and privately placed mortgage debt, and that the JPM Product's risk was less than other stable value funds and other low risk investments products. Specifically, in the meetings, prior to July, 2006 set up with Plaintiffs' representatives, JPM made these precise misrepresentations to the Plaintiffs and Plaintiffs' representatives. These representations were untrue when made and defendants knew they were untrue.

53. Contrary to its sales materials and representations given to Plaintiffs and Plaintiffs' representatives in the identified March 19 and August 1, 2005 meetings and in the first half of 2006, defendants caused the JPM Product to purchase proprietary mortgage assets JPM originated through a fund called the Mortgage Private Placement Fund ("MPPF") and that it called "Private Mortgages." In fact, during 2008 and 2009, as much as 15- 20% of all JPM Product's assets consisted of Private Mortgages originated within JPM. Along the way, JPM extracted multiple fees, beginning with the undisclosed fees from its own origination of the Private Mortgages placed within the MPPF, to undisclosed fees from the "replacement" of these mortgages into collective funds, and the fees embedded in the "Intermediate Bond Fund" placed within the JPM Stable value product.

54. The MPPF issued its own commercial loans for which it received various origination and loan fees. Then, SAIF tacked on yet an additional "management fee", charging Plaintiffs for all the fees taken, while only the last management fee was disclosed.

55. Defendants falsely advertised and sold SAIF as having lower fees than other stable value funds (or at least commensurate fees) when in fact when the undisclosed fees are considered, SAIF's fees were much higher than competing, less risky stable value funds.

56. Plaintiffs thereby became invested in "Private Mortgages" through a multistep scheme. The upshot is that defendants surreptitiously buried their fees from their origination of

24

JPM's Private Mortgages and other investments through a series of investments in JPM's Intermediate Bond Fund that were eventually held by the JPM Stable Value Product.

57.     Defendants adopted a self-dealing, fee-layering scheme, and concealed these strategies to gain multiple levels of fee extractions. Defendants took Plaintiffs' monies from the sale of the JPM Product and invested these monies in as many as five layers of other JPM-sponsored funds, including the JPM Intermediate Bond Fund. JPM utilized the JPM Intermediate Bond Fund to invest in JPM-originated or purchased Private Mortgages and other JPM Products.

58.     This fee-generating, fund-layering strategy allowed defendants not only to mask the magnitude of the JPM Product's exposure to risky investments, but also to profit from layers of undisclosed fees and expenses generated by investment in each of the many layers of the funds in question. In some cases, JPM captured fees for a fund multiple times by investing in it more than once. In some cases, such as securitized packages of auto loans, those asset back securities were actually issued by JPM affiliates.

## SAIF NOT "INVESTMENT GRADE"

59.     Neither the JPM Product's Private Mortgages nor many of its asset backed securities embedded in the JPM Product were "investment grade." Nor were the Private Mortgages rated by a third-party credit-rating agency, which would have produced an objective credit rating for such mortgages.

60.     SAIF created its own credit ratings and market values for the Private Mortgages and other unrated securities.

61.     Only SAIF utilized Private Mortgages– all other stable value funds avoided placing this kind of illiquid, non-third party rated debt in a product defined as "conservative".

62.     JPM touted to Plaintiffs and Plaintiffs' representatives that its Investment Guidelines for SAIF prohibited the purchase of issues rated below investment grade. It posted

25

this misrepresentation in "Fact Sheets" on its website. By self-rating its own Private Mortgage, JPM surreptitiously never appeared to be violating what it represented to Plaintiffs and Plaintiffs' representatives.

63. The Private Mortgages in the MPPF and SAIF has not been marked-to-market at the time defendants sold SAIF to Plaintiffs.

## Defendants' Caused Substantial Damages to Plaintiffs

64. Higher (i.e. lower rated) risk and illiquid assets (such as, among others, JPM Private Mortgages) were unsuitable for a stable value fund, and JPM recognized the inappropriate nature of this asset class before the financial crisis. Even in early 2007, while JPM was well aware that the lower-rated mortgage-based securities derived from housing mortgages were about to collapse, it continued to sell Plaintiffs these undisclosed, lower-rated and unrated mortgage products of various sorts into the JPM Stable Value Product sold to Plaintiffs. This was done to quickly grow the assets in SAIF through the promised higher yield and misrepresented lower risk which meant profits to JPM, as SAIF was a proprietary product. If JPM had touted and sold a conservative fund from a third-party, the American Century fund, for example, JPM would not get credit for all the fees—American Century would in large part get that fee. In doing so, defendants thus looked to benefit themselves while exposing risk and eventual injury to the Plaintiffs.

65. The JPM Product invested as much as 40 percent of assets in below-investment grade or illiquid assets not suitable for a stable value fund. Moreover, as discussed above, defendants concealed this by, among other improper conduct, "self-rating" their private mortgages and misrepresenting the actual risk. At times, defendants brazenly and falsely touted

26

the JPM Product as "safer" than riskless assets. This was presented in "standard deviation charts" used in 2005-2006 and widely distributed to clients of JPMRPS in order to sell the SAIF product.

66.     In the end, defendants' unlawful scheme caused Plaintiffs to pay too much – both in the purchase prices that was above the true market value and in fees. This led to diminished returns or lower yields in the JPM Product from 2008 to date.

67.     The JPM Product's Private Mortgages suffered a substantial loss of value, and the JPM Product began—post 2008—to write down the market value and related prices for the Private Mortgages and for other investment assets. This caused the JPM Product's annual yield to Plaintiffs, especially relative to competitor stable value funds, to fall. In an effort to conceal its unlawful acts, defendants have adopted the excuse of blaming the JPM Product's lower returns on other factors, when in actuality the lower returns were due to the self-dealing schemes and JPM's misrepresentations used to induce Plaintiffs to purchase the JPM Product. The JPM Product underperformed its peers.

68.     The annual returns on the JPM Product have been far less than they should have been if only assets of the represented quality and liquidity had been placed into the JPM Product.

69.     Moreover, the JPM Product began using crediting rates set by negotiation and monthly yields, rather than by the formulas required by the wrap (insurance) contracts. Those formulas were in place to protect investors in the JPM Product. If defendants had disclosed the actual conditions under which the crediting rated (yield) was being set, Plaintiffs (and others) would have been aware earlier of the real losses in the JPM Product due to Private Mortgages and other improper investments. But they were not.

70.     Furthermore, defendants intentionally omitted important accounting details about the JPM Product's investments and otherwise failed to fully advise Plaintiffs and other investors

27

in the JPM Product of market value losses related to the Private Mortgage. By not marking the Private Mortgages to market, Plaintiffs concealed from them the losses they had caused or would eventually cause to the yield on the JPM Product.

71.     Defendants gained at least two advantages from the alleged wrongful conduct: First, there was a quick build-up the problematic assets in SAIF (a small fund originally acquired in its 2005 purchase of Bank One). By pushing its own proprietary, Stable Value Fund, defendants earned bonuses and profits not available to them if they sold non-proprietary products. Second, because JPM entities were involved in multiple levels of the transactions used to create the JPM Intermediate Bond Fund sold to SAIF, JPM could and did receive substantial undisclosed fees from the Intermediate Bond Fund and assets it purchased or brought into that underlying Fund.

72.     Defendants were well aware that the actions complained of herein – both prior to and during the 2008 through 2010 period – were improper. JPM sought to keep from the public its scheme. The chief investment officer tagged with responsibility for the improper investments and poor performance was terminated. Agreements with "wrap" insurers were struck to not reveal to the public the issues with the JPM Product.

73.     Because of JPM's self-dealing in fees, Plaintiffs overpaid for purchasing (*i.e.* entering and remaining in the JPM Product) and starting in 2008 received a lower rate of return than the JPM Product would have yielded if it had been, as represented, a true stable value fund. There is a direct relationship between the losses to Plaintiffs and defendants' unlawful conduct, which proximately caused the Plaintiffs' injuries.

### FIRST CAUSE OF ACTION
**(For Violations of Missouri's Merchandising Practices Act,
Mo. Rev. Stat. §407.010, *et. seq*)**

28

74. Plaintiffs hereby incorporate by reference and re-allege all paragraphs previously alleged herein into all counts including this count. Plaintiffs assert the cause of action against all defendants.

75. Missouri's Merchants Practice Act, Mo. Rev. Stat. § 407.010, *et seq.* substantially regulates the relationship and wrongful activities set out in this Petition.

76. Plaintiffs and defendants are "persons" within the meaning of section 407.010(5).

77. Defendants' activities, marketing, and services constitute the sale of "merchandise" within the meaning of section 407.010(4).

78. Beginning in October, 2008, Plaintiffs by their continued investments and by new purchases, purchased the JPM Product and paid the fees for JPM services.

79. As set forth herein, defendants' acts, practices and conduct violate section 407.020(1) of Missouri's *Merchandising Practices Act* in that, among other things, defendants used and/or continue to use deception, misrepresentation, unfair practices, concealment, suppression and/or omission of material facts in connection with the advertising, marketing, and offering for sale of the JPM Stable Value Product.

80. Defendants' unfair and deceptive acts, practices, and conduct include concealing fees it earned and failing to disclose material facts about the monies defendants' obtained from selling the JPM Stable Value Product to Plaintiffs.

81. Defendants have also deceptively and unfairly charged loan origination and other fees to Plaintiffs.

82. Defendants' conduct violates the Missouri's Merchandising Practices Act pursuant to state regulations 15 C.S.R. § 60-8 because their conduct: (1) offends public policy;

29

(2) is unethical, oppressive, and unscrupulous; (3) causes substantial injury to consumers; (4) was not in good faith; (5) is unfair because Defendants' charged consumers for services which the customer had not ordered or solicited; and (6) is unconscionable.

83.    Defendants' acts were undertaken with malice and callous indifference to the interests of the Plaintiffs, thereby subjecting defendants to an award of punitive damages.

84.    Plaintiffs seek actual damages; a declaration that defendants' methods, acts, and practices violate the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*; disgorgement of all profits or revenues (fees) obtained from defendants' scheme; pre-and post-judgment interest; punitive damages; attorneys' fees, litigation expenses and costs; and any and all other relief that the Court deems just and proper.

## SECOND CLAUSE OF ACTION
### (Money Had and Received)

85.    Plaintiffs hereby incorporate by reference and re-allege all paragraphs previously alleged herein.

86.    Defendants have been enriched by the money they made in connection with the profits, credits, layered fees and bonuses obtained from selling the JPM Stable Value Product.

87.    Defendants obtained this money through wrongful, unfair and deceptive practices.

88.    Defendants fail or failed to provide fair consideration to Plaintiffs in exchange for the fees obtained.

89.    Defendants' acts were undertaken with malice and callous indifference to the interests and rights of Plaintiffs, thereby subjecting defendants to an award of punitive damages.

90.    Equity and good conscience require restitution to Plaintiffs. Plaintiffs have been wrongfully deprived of their money and are entitled to its restoration, along with interest thereon

30

from the date the money was taken by defendants to the date of judgment and Plaintiffs are entitled to disgorgement of money received from the multiple fees JPM gained by its scheme together with prejudgment interest on all amounts rewarded, punitive damages, attorneys' fees, expenses and costs, and any other relief the Court deems necessary and proper.

## THIRD CAUSE OF ACTION
### (For Unjust Enrichment)

91.    Plaintiffs hereby incorporate by reference and re-allege all paragraphs previously alleged herein.

92.    Defendants have received and continue to receive benefits (profits, bonuses, credits and fees) at the expense of Plaintiffs and it is inequitable for defendants to retain these benefits.

93.    Through their ultimate payment of the multiple fees, Plaintiffs have conferred monetary benefit on defendants and defendants have unjustly profited from that monetary benefit. Plaintiffs have not received any corresponding benefit.

94.    Defendants have accepted and retained the benefits unfairly conferred upon them to the detriment of Plaintiffs.

95.    Defendants' actions were undertaken with malice and callous indifference to the interests of Plaintiffs, thereby subjecting defendants to an award of punitive damages.

96.    As a direct and proximate result of defendants' unlawful acts and practices, Plaintiffs have been wrongfully deprived of their money and are entitled to its restoration, along with interest thereon from the date the money was taken by the defendants to the date of judgment, JPMS has been unduly and inequitably enriched and is not entitled to keep the fruits of its unjust scheme, all these monies should be awarded plaintiffs along with prejudgment

31

interest, punitive damages as well as attorneys' fees, expenses and costs, corrective notice, and any other relief the court deems necessary and proper.

## FOURTH CAUSE OF ACTION
### (For Fraud)

97.    Plaintiffs hereby incorporate by reference and re-allege all paragraphs previously alleged herein.

98.    Defendants represented the JPM Stable Value Product was a conservative investment option, having both superior performance and less risk than other stable value products, that it was invested in investment grade fixed-income securities, that it was invested in a high-quality fixed income portfolio, that it was the most conservative of investments and that it was safer than US Treasuries, and defendants failed to disclose that the JPM Stable Value Product contained low quality and high risk investments, many of which were originated or previously held by JPM, for which JPM received multiple excessive and undisclosed fees.

99.    Defendants had a duty to make full and accurate representations to Plaintiffs and to disclose all relevant and material facts about the JPM Product.

100.   Defendants representations were false in that the assets and JPM Private Mortgages placed into the JPM Stable Value Product were inappropriate for a stable value product, were not investment grade fixed income securities, were not high-quality, were not the most conservative of investments, were not safer than US Treasuries and violated the credit rating and investment guidelines for the JPM Product.

101.   Defendants knew the representations were material and were false when made and knew their failures to disclose would be material to Plaintiffs' decision to purchase and remain invested in the JPM Product.

32

102. Plaintiffs relied on defendants' false representations and omissions in deciding to purchase and remain invested in the JPM Product.

103. Defendants acts and omissions were undertaken with malice and callous indifference to the interests of Plaintiffs, thereby subjecting defendants to an award of punitive damages.

104. Defendants' conduct constitutes fraud and Plaintiffs seek actual damages, pre- and post-judgment interest, punitive damages, attorneys' fees and costs and any and all other relief that the Court deems just and proper.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs requests judgment and relief on all causes of action as follows:

A.     For an order declaring that defendants have violated the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*;

B.     For an order directing defendants to disgorge all fees obtained from their unfair and deceptive practices; including the monies JPM got from their management fee in SAIF and from the multi-layering of fees enabled by Plaintiffs' purchases of the JPM Stable Value Product.

C.     For an order awarding Plaintiffs' damages in an amount to be proven at trial, together with pre-trial and post-trial interest thereon;

D.     An award of punitive charges against each defendant.

E.     For an order awarding Plaintiffs' attorneys' fees, litigation expenses, and costs of suit; and

33

F.    For an order awarding such other and further relief as this Court deems just and proper.

**JURY DEMAND**

WHEREFORE Plaintiffs' hereby demand a trial by jury on all issues that are triable to a jury.

Dated: September  (2 , 2012

Respectfully submitted,

**ROUSE HENDRICKS GERMAN MAY PC**

Randall E. Hendricks   MO #24832
Lawrence A. Rouse MO #25064
1201 Walnut, Suite 2000
Kansas City, MO 64106
Telephone: 816-471-7700
Facsimile: 816-471-0794

**COUNSEL FOR PLAINTIFFS**

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI, AT INDEPENDENCE**
**SIXTEENTH JUDICIAL CIRCUIT OF MISSOURI**
**(INDEPENDENCE)**

Stahr D. Ashurst )
1609 S. Whitney Dr. )
Independence, MO 64057 )
)
Valerie Arrocha )
3744 Elmwood )
Kansas City, MO 64128 )
)
LeAnn M. Belew )
521 SW Moore )
Blue Springs, MO 64014 )
)
Linda Sue Beltz )
2601 S. Milton Dr. )
Independence, MO 64055 )
)
Brandy Blackmon )
2617 N. Twyman Rd )
Independence, MO 64058 )
)
Lori Boniedot )
1331 S. Randall Rd. )
Independence, MO 64055 )
)
Sheila R. Brock )
2848 SW Carlton Dr. )
Lee's Summit, MO 64082 )
)
Kathleen Burmeister )
511 SE 19th St. )
Oak Grove, MO 64075 )
)
Jeanetta Cobb )
3605 NW Hidden Pointe Dr. )
Blue Spring, MO 64015 )
)
Kathy Cox )
405 N. Cochise Dr. )
Independence, MO 64056 )
)
Heather D. Craft )
1427 ½ South Sterling Ave. )

CASE NO. 1216-CV23784

DIVISION 16 (Judge Roldan)

JMD

FILED-CIRCUIT COURT, JACKSON CO., MO·i
2012 SEP 20 PM 3:28

1

Independence, MO 64052                          )
                                                )
Brenda S. Dannaldson                            )
829 N. Ponca Dr.                                )
Independence, MO 64056                          )
                                                )
Cicilyn Davis                                   )
4906 Wallace Ave.                               )
Kansas City, MO 64129                           )
                                                )
Terri Davis                                     )
17917 S. Hilltop Rd.                            )
Pleasant Hill, MO 64080                         )
                                                )
Shirley Dieckhoff                               )
721 N. Sioux Ave.                               )
Independence, MO 64056                          )
                                                )
Gayla Dowell                                    )
16921 York Ave.                                 )
Independence, MO 64055                          )
                                                )
Heather Downey                                  )
3572 NE Austin                                  )
Lee's Summit, MO 64064                          )
                                                )
Wilma J. Ebert                                  )
950 S. State Route 7                            )
Independence, MO 64056                          )
                                                )
Karen Euritt                                    )
26307 E. Blue Mills Rd.                         )
Sibley, MO 64088                                )
                                                )
Margaret A. Evans                               )
10216 E. 96th St.                               )
Kansas City, MO 64134                           )
                                                )
Sara Ferguson                                   )
2905 NW 4th St. Terr.                           )
Blue Springs, MO 64014                          )
                                                )
Cathleen R. Frantz                              )
707 W. Hwy 224                                  )
Wellington, MO 64097                            )
                                                )

2

Lynn Frentrop                          )
1213 NE 82nd Terr.                     )
Independence, MO 64118                 )
                                       )
Charlene Fitzhugh                      )
8708 E. 92nd Pl.                       )
Kansas City, MO 64138                  )
                                       )
Kimberly Foudree                       )
4424 NE Shadow Valley Cir.             )
Lee's Summit, MO 64064                 )
                                       )
Emily Galloway                         )
3613 Lake Shore Dr.                    )
Blue Springs, MO 64014                 )
                                       )
Sharon Grammer                         )
2017 N. Ponca Dr.                      )
Independence, MO 64058                 )
                                       )
Linda Green                            )
6515 NW Quail Run Dr.                  )
Parkville, MO 64152                    )
                                       )
Lynn Green                             )
1410 E. Salem Ln.                      )
Olathe, KS 66062                       )
                                       )
Patricia Hake                          )
304 NE Forest Ave., Apt. C             )
Lee's Summit, MO 64063                 )
                                       )
Kayla Hale                             )
526 El Lago Circle                     )
Climax Springs, MO 64324              )
                                       )
Minnie Henson                          )
12206 E. 56th Terrace                  )
Kansas City, MO 64133                  )
                                       )
Myrle Hill                             )
5279 Spruce                            )
Kansas City, MO 64130                  )
                                       )
Janice Hohenburg                       )
16612 E. Gudgell, Apt. D               )

3

Independence, MO 64055 )
                                      )
Deborah Hopkins                       )
19202 E. 28th St. S.                  )
Independence, MO 64057                )
                                      )
Vicki Hopkins                         )
27606 Rogers Rd.                      )
Buckner, MO 64016                     )
                                      )
Lynn Huff                             )
3611 S. Bolger Ct.                    )
Independence, MO 64055                )
                                      )
Melanie Jefferson                     )
1405 E. 66th St.                      )
Kansas City, MO 64131                 )
                                      )
Soteria Jenkins                       )
2514 N. Six Mile Church Rd.           )
Independence, MO 64058                )
                                      )
Cynthia Jones                         )
3337 Askew                            )
Kansas City, MO 64128                 )
                                      )
Robert Kordalski                      )
17925 Mission Rd.                     )
Stillwell, KS 66085                   )
                                      )
Tamara Liber                          )
19703 NE 197th Terr.                  )
Smithville, MO 64089                  )
                                      )
Paula Luna                            )
200 S. Shrank Ave.                    )
Independence, MO 64056                )
                                      )
Pamala McGee                          )
1900 N. Concord Rd.                   )
Independence, MO 64058                )
                                      )
Leona McGinnis                        )
16414 E. Cogan Rd.                    )
Independence, MO 64055                )
                                      )

4